U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

**TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET**



**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 15, 2009**

**United States Bankruptcy Judge**

___

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| BROOK MAYS MUSIC COMPANY, | § | CASE NO. 06-32816-SGJ-7 |
| | § | |
| DEBTOR. | § | |
| | § | |
| ROBERT YAQUINTO, as Chapter 7 Trustee for Brook Mays Music Company, | § § § § | |
| PLAINTIFF, | § § | |
| VS. | § § | ADVERSARY NO. 08-3238 |
| ARROW FINANCIAL SERVICES, | § § | |
| DEFENDANT. | § | |

### MEMORANDUM OPINION AND ORDER GRANTING IN SUBSTANTIAL PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

CAME ON FOR CONSIDERATION before this court the Defendant's Motion for Summary Judgment, the Trustee's/Plaintiff's Response thereto, Defendant's Reply thereto, and related affidavits and other items submitted in connection therewith.

1

A.   PROCEDURAL CONTEXT.

This is a suit against a former service-provider to (and creditor of) the Debtor to avoid certain payments made to it during the 90-day period before the Debtor's bankruptcy filing, on the grounds that such payments were either preferential or fraudulent transfers.  11 U.S.C. § 547(b); 11 U.S.C. § 548(a)(1)(A) and (B).

The bankruptcy case of Brook Mays Music Company ("Brook Mays" or the "Debtor") was filed on July 11, 2006 (the "Petition Date") as a voluntary Chapter 11 case.  The case was converted to a Chapter 7 bankruptcy case on March 29, 2007, after a court-approved Section 363 sale of substantially all of the assets of the Debtor.  Robert Yaquinto was thereafter appointed as the Chapter 7 Trustee.  The Trustee subsequently filed this adversary proceeding against Arrow Financial Services ("Arrow") on July 8, 2008, asserting that three (3) separate payments made by Brook Mays to Arrow within 90 days of the Petition Date (two of which were by check and one of which was by wire transfer), and each of which was in the amount of $55,200, thus aggregating $165,600, constituted avoidable, preferential transfers, and possibly (alternatively) avoidable fraudulent transfers.  The Transfers (hereinafter so called) are described more fully as follows:

*1. Transfer No. 1* **(Check #0222225, in the amount of $55,200, sent by regular mail)**

| Invoice Date | Payment Sent | Payment Rec'd | Clear Date |
|---|---|---|---|
| 4/4/06 | 5/12/06 | 5/22/06 | 5/23/06 |

*2. Transfer No. 2* **(sent by wire transfer, in the amount of $55,200)**

| Invoice Date | Payment Sent | Payment Rec'd | Clear Date |
|---|---|---|---|
| 2/3/06 | 6/8/06 | 6/8/06 | 6/8/06 |

*3. Transfer No. 3* **(Check #0223692, in the amount of $55,200, sent by Federal Express Overnight Mail)**

| Invoice Date | Payment Sent | Payment Rec'd | Clear Date |
|---|---|---|---|
| 5/2/06 | 6/27/06 | 6/29/06 | 6/30/06 |

There are no disputed facts in this adversary proceeding. Specifically, the parties agreed at oral argument that the summary judgment evidence was not disputed by either party and that no further evidence would be submitted if there were to be a trial. The parties agreed that there was no need for any witness testimony. In other words, the parties agree completely as to what payments were made to Arrow and when, and for what, during the course of dealings between the Debtor and Arrow, and the parties also agree that the elements of Section 547(b) of the Bankruptcy Code are met with regard to the Transfers. Accordingly, the interpretation of the undisputed facts is all that remains at issue. Specifically, do the undisputed facts give rise to a valid "ordinary course of business" defense on the

part of Arrow, or a subsequent "new value" defense, or not?

The court has determined that the Defendant is entitled to summary judgment: (a) as to Transfer No. 1 on the "ordinary course of business" defense; (b) as to Transfer No. 2 on the "subsequent new value" defense; (c) partially as to Transfer No. 3 on the "subsequent new value" defense—specifically, $49,680 of Transfer No. 3 is avoidable, there being $5,520 of subsequent new value to use as a credit against it; and (d) as to all three Transfers on the fraudulent transfer count.

**B.   UNDISPUTED FACTS.**

The undisputed facts are as follows:

1.   Brook Mays was in the retail music business with multiple stores and specialized in renting and selling band and orchestra instruments and related items.

2.   Arrow provided collection services for Brook Mays. Arrow is not an "insider" of the Debtor.  11 U.S.C. § 101(31).

3.   Arrow and Brook Mays commenced a business relationship together approximately one year before the Petition Date (*i.e.,* in June 2005).

4.   No formal, written agreement between Arrow and Brook Mays was submitted as part of the summary judgment evidence. However, the parties agree that Arrow billed Brook Mays for Arrow's collection services on a monthly basis, at a contractual rate multiplied by the number of Arrow employees assigned on a

full time basis to the task.  Arrow always generated an invoice to Brook Mays during the first 1-5 days of the month, reflecting the amount due for the previous calendar month (the one and only exception being the first month that the parties did business together—*i.e.,* Arrow invoiced Brook Mays on July **12**, 2005, for the June 2005 time period).  Arrow always billed Brook Mays at the same rate (*i.e.,* all monthly invoices were for $55,200, except for the first two months' invoices—for June 2005 and July 2006—which were each for $50,400).  All of Arrow's invoices simply stated that "prompt payment" was expected to be mailed to Arrow at a physical address in Illinois.  In other words, there was no specific payment due date.

5. During their course of dealing, Brook Mays made eleven (11) monthly payments to Arrow, three (3) of which fell during the 90-day period prior to the Petition Date (*i.e.,* the "Preference Period"), and eight (8) of which fell during the Pre-Preference Period (hereinafter so called).

### (i) Analysis of the Eight (8) Payments Made in the Pre-Preference Period.

6. All of the payments to Arrow during the Pre-Preference Period were made by check.

7. Seven (7) out of the eight (8) payments were sent by regular mail and one (in September 2005) was sent by Federal Express Overnight Mail.

8. Further, with regard to the eight (8) payments made

5

during the Pre-Preference Period, it is undisputed that the following statistics apply:[1]

    (a) The average number of days between the invoice date and the mailing date by Brook Mays was ***25.25 days.***  However, the range of days was fairly broad:  with checks being mailed anywhere from ***nine (9) days to 55 days*** after the invoice date. Six (6) out of eight (8) payments were mailed in 30 days or less after the invoice date; one (1) payment was mailed 39 days after the invoice date; and one payment was mailed 55 days after the invoice date.

    (b)  The average number of days between the invoice date and the receipt of payment by Arrow was ***35.75 days.*** However, once again, the range of days was fairly broad:  with checks being received anywhere from ***21 days to 59 days*** after the invoice date.  Four (4) out of eight (8) payments were received by Arrow in 30 days or less after the invoice date; two (2) out of eight (8) payments were received 41 days after the invoice date; and two (2) out of eight (8) payments were received 51-59 days after the invoice date.

---

[1] These statistics are ascertainable from the demonstrative aid that was submitted as "Exhibit 2" by Arrow at the summary judgment hearing.  The Trustee did not object to, or refute the accuracy of this demonstrative aid.  The Arrow invoices themselves (from which much of the information in Exhibit 2 was derived), were part of Arrow's summary judgment evidence and were not disputed.

(c) The average number of days between the invoice date and the clear date of the checks was ***37.125 days.*** However, the range of days was once again fairly broad: with checks clearing anywhere from ***22 days to 62 days*** after the invoice date. Four (4) out of eight (8) checks cleared between 22 and 27 days after the invoice date; two (2) out of eight (8) checks cleared 42 days after the invoice date; and two (2) out of eight (8) checks cleared between 53 and 62 days after the invoice date.

### (ii) Analysis of the Three (3) Payments Made in the Preference Period.

9. One of the payments made to Arrow during the Preference Period was by wire transfer (Transfer No. 2). The other two transfers were made by check, which was consistent with historical practice.

10. Transfer No. 3 was sent by Federal Express Overnight Mail. This mode of delivery had only been used one (1) out of eight (8) times during the Pre-Preference time period. Transfer No. 1 was sent regular mail, consistent with the usual historical practice. Transfer No. 3 (as earlier mentioned) was an atypical wire so there was no mail or Federal Express delivery.

11. Further, with regard to the three (3) payments made during the Preference Period, it is undisputed that the following statistics apply:[2]

---

[2] *See* footnote 1, *supra*.

(a) The average number of days between the invoice date and the mailing date by Brook Mays was **_73 days._** However, the range of days was fairly broad: with checks being mailed anywhere from **_38 days to 125 days_** after the invoice date. Transfer No. 1 was mailed 38 days after the invoice date; Transfer No. 2 was mailed 125 days after the invoice date; and Transfer No. 3 was mailed 56 days after the invoice date.

(b) The average number of days between the invoice date and the receipt of payment by Arrow was **_77 days._** However, once again, the range of days was fairly broad: with checks being received anywhere from **_48 days to 125 days_** after the invoice date. Transfer No. 1 was received by Arrow 48 days after the invoice date; Transfer No. 2 was received by Arrow 125 days after the invoice date; and Transfer No. 3 was received by Arrow 58 days after the invoice date.

(c) The average number of days between the invoice date and the clear date of the checks was **_77.66 days._** However, the range of days was once again fairly broad: with checks clearing anywhere from **_49 days to 125 days_** after the invoice date. Transfer No. 1 cleared 49 days after the invoice date; Transfer No. 2 cleared 125 days after the invoice date; and Transfer No. 3 cleared 59 days after the invoice date.

**C.  CONCLUSION AND JUDGMENT.**

12. In analyzing the "ordinary course of business" defense,

11 U.S.C. § 547(c)(2)(A),[3] courts in this district have held that one considers: the timing of payments; the amount and manner in which the transactions were paid; and the circumstances under which the transfers were made. *See Plan Admin. Agent v. Nat'l Shelter Prods. (In re Kevco, Inc.),* No. 4-03-04051-BJH, 2004 Bankr. LEXIS 332, at *15-16 (Bankr. N.D. Tex. Mar. 22, 2004). *See also Cunningham v. T & R Demolition, Inc. (In re ML Assocs., Inc),* 301 B.R. 195, 204 (Bankr. N.D. Tex. 2003). *See also Mossay v. Hallwood Petroleum,* No. 3:96-CV-2898-P, 1997 U.S. Dist. LEXIS 16553, at *13-14 (N.D. Tex. Apr. 28, 1997). Thus, one looks at the length of time the parties were engaged in business and whether the alleged preferential transfers differed from past practices, as far as amount or form of tender; whether the creditor was engaged in any unusual collection activity; and the overall circumstances.

13. Viewing the undisputed summary judgment evidence in the light most favorable to the Trustee, the court holds that Arrow is entitled to a judgment that Transfer No. 1 was a payment of a debt incurred by the Debtor in the ordinary course of business or financial affairs of the Debtor and the transferee, and that Transfer No. 1 was made in the ordinary course of business or affairs of the Debtor and the transferee. Both the manner of

---

[3] Note that the Section 547(c)(2)(B) "ordinary business terms" objective defense was not raised by Arrow in its motion for summary judgment.

9

payment (check) and the mode of delivery (regular mail) were consistent with the usual historical practice. The amount paid ($55,200) was consistent with past practice, and the timing of payment was ***well within the range*** of historical pre-preference period practices. Specifically, Transfer No. 1 was mailed ***38*** days after the invoice date (the range during the Pre-Preference Period was ***nine (9) days to 55 days***). Transfer No. 1 was received by Arrow ***48*** days after the invoice date (the range during the Pre-Preference Period was ***21 days to 59 days***). Transfer No. 1 cleared ***49*** days after the invoice date (the range during the Pre-Preference Period was ***22 days to 62 days***). Finally, there was no summary judgment evidence suggesting unusual collection activity with regard to Transfer No. 1. There are no overall circumstances to suggest anything out of the ordinary regarding Transfer No. 1.

14. Viewing the undisputed summary judgment evidence in the light most favorable to the Trustee, the court holds that Transfers No. 2 and 3 do not qualify for the "ordinary course of business" defense. 11 U.S.C. § 547(c)(2)(A). Arrow conceded this with regard to Transfer No. 2—which was made extraordinarily later than the norm (125 days after invoice date) and which was made by wire transfer (a payment mode never historically used). Moreover, there was summary judgment evidence (unrefuted emails) showing some atypical collection activity on the part of Arrow.

Similarly, with regard to Transfer No. 3, it was made somewhat later than the norm (mailed 56 days after the invoice date);[4] received by Arrow 58 days after the invoice date;[5] cleared 59 days after the invoice date;[6] and sent by Federal Express Overnight Mail (an atypical mode of delivery having only been used one (1) out of eight (8) times during the Pre-Preference Period). Evaluating Transfers No. 2 and 3 with all the statistical data summarized in paragraphs eight (8) and eleven (11) above, the court cannot conclude that these transfers qualify for the "ordinary course of business" defense, under the overall circumstances.[7]

15. However, it is clear that Arrow provided significant unpaid, subsequent "new value" after receiving Transfers No. 2 and 3. *See* 11 U.S.C. § 547(c)(4)(B). The question is, how much

---

[4] The range of days between mailing and invoice date was 9-55 days during the Pre-Preference Period.

[5] The range of days between receipt and invoice date was 21-59 days during the Pre-Preference Period.

[6] The range of days between clear date and invoice date was 22-62 days during the Pre-Preference Period.

[7] Transfer No. 3 is a harder call than Transfer No. 2. As alluded to in the prior two footnotes (and set forth in Exhibit 2 from the summary judgment hearing), there was one payment in the Pre-Preference Period (i.e., a payment related to an August 2, 2006 invoice) with a slightly longer time period between invoice date and mailing and receipt than Transfer No. 2. However, this payment relating to the August 2, 2006 invoice was clearly an outlier or aberration. Six (6) out of the eight (8) payments made in the Pre-Preference Period were both mailed and received in less than 45 days.

can be utilized in this adversary proceeding?

16.  Arrow has filed an undisputed proof of clam in the amount of $128,616 [Claim # 74], asserting that it is owed $128,616 for an unpaid May 2006 invoice ($55,200), an unpaid June 2006 invoice ($55,200), plus a prorated portion of July 2006 for the prepetition services Arrow provided to Brook Mays from July 1-11, 2006 ($18,216).  However, while this aggregate, unpaid amount ($128,616) is more than Tranfers No. 2 and No. 3 in the aggregate ($110,400), not all of this $128,616 can be utilized as subsequent new value.  The reason for this is that Transfer No. 2 was received by Arrow on June 8, 2006 (and cleared on June 8, 2006).[8]  Thus, only services provided by Arrow to Brook Mays **_after_** June 8, 2006, can potentially be utilized as subsequent new value.  Similarly, Transfer No. 3 was received by Arrow on June 29, 2006 (and cleared on June 30, 2006).[9]  Thus, only services provided by Arrow to Brook Mays after June 29, 2006, can potentially be utilized as subsequent new value with regard to Transfer No. 3.  Since, none of the services provided by Arrow to Brook Mays after June 8, 2006 (through the July 11, 2006 Petition Date) were paid for by Brook Mays, all of these services can be used as subsequent new value as to Transfer Nos. 2 and 3.  Using

---

[8] Transfer No. 2 was a payment on account of January 2006 services provided by Arrow and invoiced on February 3, 2006.

[9] Transfer No. 3 was a payment on account of April 2006 services provided by Arrow and invoiced on May 2, 2006.

12

a *per diem* proration, since the June and July 2006 services were billed at $55,200 per month, this would equate to a daily rate for services provided by Arrow to Brook Mays of approximately $1,840 per day ($55,200 divided 30 days, equals $1,840 per day). There were 33 days between June 8, 2006 and July 11, 2006. Multiplying 33 times $1,840 equals $60,720. Thus, the court determines that there was $60,720 of subsequent new value available to Arrow to use as a credit against Transfer Nos. 2 and 3, which first should be applied against Transfer No. 2 (up to the $55,200 payment amount), and then can be applied until exhausted against Transfer No. 3. Since Transfer Nos. 2 and 3 aggregate $110,400, the preference liability of Arrow is $49,680.[10]

17. Finally, the court notes that no summary judgment

---

[10] The court notes that counsel for the Trustee noted at one point during oral arguments that the Trustee was acknowledging there was $107,372.90 of subsequent new value provided. Transcript of Summary Judgment Hearing, p. 41 lines 14-23. Arrow's counsel jumped in at that juncture, and argued that there must be a mere $3,027.10 in potential preference liability in dispute—assuming Transfer No. 1 was subject to an "ordinary course of business defense" (*i.e.,* Transfer Nos. 2 and 3 being two payments at $55,200 = $110,400, minus $107,372.90 = $3,027.10). However, the court does not believe that the Trustee's counsel intended this interpretation. Rather, the court believes that she may have been referring to a situation where none of the Transfers were deemed to be ordinary course transfers (so that all unpaid services provided by Arrow after the May 2006 receipt of Transfer No. 1 were added up as part of the new value). This court believes, since Transfer No. 2 was received on June 8, 2006, that the only new value that is relevant is new value provided after June 8, 2006.

13

evidence was put forward by the Trustee supporting the theory that the Transfers were fraudulent transfers, pursuant to Sections 548(a)(1)(A) or (B) of the Bankruptcy Code. For example, no evidence was presented which created a genuine fact issue as to any fraudulent intent on the part of Brook Mays, or that the Transfers were for less than reasonably equivalent value or the like. Thus, Arrow is entitled to summary judgment that the Transfers were not fraudulent transfers.

Based on the foregoing, it is hereby

**ORDERED** that the Defendant, Arrow, is granted summary judgment in part as follows:

  A. Based on the undisputed summary judgment evidence, the Transfers are hereby ruled to not be fraudulent transfers as a matter of law.

  B. Based on the undisputed summary judgment evidence, Transfer No. 1 is hereby ruled as not avoidable as a preference, since it was subject to a valid "ordinary course of business" defense pursuant to Section 547(c)(2)(A) of the Bankruptcy Code.

  C. Based on the undisputed summary judgment evidence, Transfer No. 2 is hereby ruled as not avoidable as a preference, since it was subject to a valid "new value" defense, pursuant to Section 547(c)(4)(B) of the Bankruptcy Code, as $60,720 of unpaid subsequent new value was provided by Arrow to Brook Mays after Arrow received Transfer No. 2.

D.  Based on the undisputed summary judgment evidence, Transfer No. 3 is hereby ruled as only partially avoidable as a preference, since it was subject to a partial, valid "ordinary course of business" defense, pursuant to Section 547(c)(4)(B) of the Bankruptcy Code.  Specifically, there was $5,520 of unpaid (and unutilized in connection with Transfer No. 2) subsequent new value provided by Arrow to Brook after Arrow received Transfer No. 3 that can be used as a credit on Transfer No. 3, so that only $49,680 of Transfer No. 3 is avoidable ($55,200 minus $5,520 of new value equals $49,680).

**IT IS FURTHER ORDERED** that, based on the representations of the parties that no further evidence would be put on at any trial and that the summary judgment record should apply in this matter, the Trustee is entitled to Judgment against Arrow in the amount of $49,680, pursuant to Sections 547 and 550 of the Bankruptcy Code, based on the reasons stated herein.  The Trustee shall upload a separate form of Judgment reflecting the same.

###END OF MEMORANDUM OPINION AND ORDER###